UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| VALVOLINE, LLC, ) | |
| ) | |
| Plaintiff, ) | Civil No. 5:20-cv-00168-GFVT |
| ) | |
| V. ) | |
| ) | **OPINION** |
| HARDING RACING, LLC, ) | **&** |
| ) | **ORDER** |
| Defendant. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Sometimes it is unfair and unconstitutional for a defendant to be required to defend a lawsuit in an out of state forum. If there are not enough contacts with the forum, then the court has no personal jurisdiction and no power to decide the case. That is precisely the argument made here by Harding Racing, LLC. As explained below, it is correct. Consequently, Harding's Motion to Dismiss will be **GRANTED**.

**I**

The Plaintiff, Valvoline, LLC, is a Delaware company with its principal place of business in Lexington, Kentucky. [R. 1 at 1.] The Defendant, Harding Racing, LLC, is an Indiana company with its principal place of business in Speedway, Indiana. [*Id.*] In 2018, a Harding representative approached Valvoline in Lexington, Kentucky with a Sponsorship Proposal. [*Id.* at 2.] Harding's Proposal was for Valvoline to act as a traditional sponsor for Harding's racing team and car in the Verizon IndyCar Series. [R. 9 at 2.] Valvoline was not interested in Harding's Proposal, and rejected it. [R. 8 at 2.] At some point thereafter, Valvoline approached

Harding regarding other business opportunities.[1]  [*Id.*]  As a result of their later discussions, the two parties entered into a Brokerage and Sponsorship Agreement.  [R. 6-1 at 2.]  Harding negotiated the terms of the Agreement with Valvoline representatives working out of the Indianapolis office.  [R. 8 at 2.]  Valvoline claims that, despite this fact, the Indianapolis Valvoline representatives took their direction from an executive working in Lexington, Kentucky.  [*Id.*]

All of the discussions and negotiations surrounding the Agreement were conducted remotely.  [*Id.*]  Harding signed the Agreement in Indiana, while Valvoline signed in Kentucky.  [R. 9 at 2.]   The terms of the Agreement required Harding to act as a broker liaison for the sale of Valvoline products with the payment of a commission by Valvoline.  [R. 6-1 at 2.]  Under the Agreement, Harding was to contact and solicit orders of Valvoline's products from customers delineated in Schedule "B" of the Agreement.  [R. 6- at 3.]  All of the customers were located within Indiana.  [R. 1-1 at 9.]  On August 16, 2018, Valvoline advanced Harding $750,000.00 to be "used to support [Harding's] racing efforts in the Verizon IndyCar Series ('SERIES') and … deemed a prepayment of any commissions earned pursuant to this Agreement." [R. 1-1 at 3.]  The prepayments were intended to offset any commissions earned by Harding pursuant to the Agreement.  [*Id.*]  Valvoline thereafter accused Harding of failing to perform under the terms of the Agreement.  [R. 1 at 3.]  As a result, Valvoline terminated the Agreement on April 30, 2019.  [*Id.*]  Valvoline brought the present action, based on breach of contract and replevin, seeking the return of the $750,000.00 advance and seeking possession of specified collateral owned by

---

[1] While Valvoline attempts to frame the negotiations surrounding the Agreement as flowing naturally from the initial Proposal, the Plaintiff's factual assertions and the Defendant's undisputed factual assertions reveal that (1) Valvoline initiated the negotiations surrounding the subsequent Agreement, *see* [R. 8 at 8] ("the Agreement that was reached was the result of a counterproposal"); (2) at all relevant times, Harding remained in Indiana; (3) Harding negotiated the terms of the Agreement with representatives from the Indianapolis office; and (4) the terms of the Agreement were substantively different from the terms of the Harding's initial Proposal.  [R. 9 at 6–7.]

Harding. [*Id.* at 4–5.] Harding has filed a Motion to Dismiss based on the Court's lack of personal jurisdiction over Harding pursuant to Rule 12(b)(2). [R. 6.] Harding also argues that Valvoline's complaint should be dismissed for improper venue pursuant to Rule 12(b)(3). [*Id.* at 7.]

## II

### A

The decision as to whether a forum has jurisdiction over a particular defendant "is not an idle or perfunctory inquiry; due process demands that parties have sufficient contacts with the forum state so that it is fair to subject them to jurisdiction." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012) (citing *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). Federal courts may not exercise personal jurisdiction over a particular defendant "unless courts of the forum state would be authorized to do so by state law," and if such jurisdiction also comports with the United States Constitution's due process requirements. *Id.* (quoting *Int'l Techs. Consultants v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997)).

The due process clause in the Fifth and Fourteenth Amendments to the United States Constitution protects individuals and corporations from being subjected to judgments in a forum with which the individual or corporation has not established any meaningful "contacts, ties, or relations." *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S. Ct. 154, 90 L. Ed. 95 (1945). This provides some measure of predictability to the legal system so that defendants have "fair warning" as to where they could be sued. *Burger King Corp.*, 471 U.S. at 475. In order "to assert specific jurisdiction over an out-of-state defendant who has not consented to suit" in a particular forum, the defendant must have "purposefully directed his activities at residents of the

forum," *and* the litigation must result from "alleged injuries that arise out of or relate to those activities." *Id.* at 472–73 (citations omitted).

Ordinarily, the plaintiff bears the burden of establishing by a preponderance of the evidence whether personal jurisdiction exists over a non-resident defendant. *Conn*, 667 F.3d at 711. Where, as here, a defendant has moved to dismiss a case for lack of personal jurisdiction under Rule 12(b)(2), and the court resolves the issue based on written submissions rather than after an evidentiary hearing or discovery, the court must consider the pleadings and submitted affidavits "in the light most favorable to the plaintiff," while also considering "the defendant's undisputed factual assertions." *Id.*; *see also Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007); *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006). The plaintiff, however, must still make "a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Whether subject-matter jurisdiction is under federal question or diversity, the court must determine whether personal jurisdiction exists by first examining if the forum state's relevant long-arm statute authorizes jurisdiction. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992); *see Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002); *see also Community Trust Bancorp, Inc. v. Community Trust Financial Corp.*, 692 F.3d 469, 471 (6th Cir. 2012) (quoting *Bird v. Parsons*, 289 F.3d at 871). If so, the court must next determine whether the exercise of that jurisdiction also comports with federal due process requirements. *Bird v. Parsons*, 289 F.3d at 871; *Air Prods. & Controls, Inc.*, 503 F.3d at 550. In states such as Kentucky, which do not permit exercise of personal jurisdiction to the full extent of constitutional due process, the court must make two determinations — whether jurisdiction

4

satisfies both the state's long-arm statute and constitutional due process. When interpreting the state's long-arm statute, the interpretation of the state's highest court is dispositive. *See Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403 (Fed. Cir. 2009).

**1**

The Kentucky Supreme Court has clarified how Kentucky's long-arm statute is to be applied. *See Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51 (Ky. 2011). The Kentucky Supreme Court rejected previous caselaw interpreting Kentucky's long-arm statute as extending to the limits of federal due process jurisdictional standards, *id*. at 55, and specifically overruled previous caselaw which skipped over an analysis of the statute itself and proceeded directly to a federal due process analysis. *Id.* at 57; *see also Barker v. Patrick Collins, Inc.*, 2013 U.S. Dist. LEXIS 101036, 2013 WL 3790904 (W.D. Ky. July 19, 2013) (referencing *Caesars Riverboat Casino* when stating that the Kentucky Supreme Court "clarified that the long-arm statute is not, *per se*, coextensive with the limits of federal due process").

Now, under current Kentucky law, in order to exercise personal jurisdiction over non-resident defendants, courts must follow a two-step analysis which first determines whether "the cause of action arises from conduct or activity of the defendant that fits into one of the [long-arm] statute's enumerated categories." *Caesars Riverboat Casino*, 336 S.W. 3d at 57. Only when a court has determined that the defendant's activities fit into one of the nine categories listed in KRS 454.210, should the court proceed to the second step of determining whether the exercise of personal jurisdiction would offend the defendant's federal due process rights. *Id.* at 57; *see, e.g., KFC Corp. v. Wagstaff*, 502 B.R. 484, at *8 (W.D. Ky. 2013) (applying the two-step analysis described in *Caesars Riverboat Casino* by first determining if the cause of action "arises from" conduct or activity fitting into one of the nine enumerated activities in KRS

5

454.210, and secondly considering whether exercising personal jurisdiction was proper under a federal due process analysis). If, however, the defendant's activities do not fit into one of the statute's enumerated categories, "then *in personam* jurisdiction may not be exercised," and the inquiry ends. *Caesars Riverboat Casino*, 336 S.W. 3d at 57; *see, e.g., Luvata Electrofin, Inc. v. Metal Processing Intern., LP*, 2012 U.S. Dist. LEXIS 128315, 2013 WL 3961226, at *3 (W.D. Ky. Sept. 10, 2012) (explaining that the court will turn to the constitutional due process inquiry only if it first finds that it can exercise personal jurisdiction over defendants under Kentucky's long-arm statute); *Bondurant v. St. Thomas Hosp.*, 366 S.W. 3d 481, 486 (Ky. App. 2011) (citing *Caesars Riverboat Casino*, 336 S.W.3d at 57, in support of court's decision that because personal jurisdiction could not be exercised under KRS 454.210, no analysis of federal due process requirements for exercise of personal jurisdiction was necessary). Thus, there may be situations in which the defendant's activities or contacts with the forum state may be enough to satisfy jurisdiction for purposes of constitutional due process, but still not be permitted by Kentucky's long-arm statute. *Citizens Nat. Bank of Paintsville v. MCNB Bank and Trust Co.*, 2013 U.S. Dist. LEXIS 105913, 2013 WL 3894996, at *2 (E.D. Ky. July 26, 2013).

Moreover, Kentucky's Supreme Court further held that the phrase "arising from" in the long-arm statute should be interpreted to mean that the "cause of action must have originated from, or came into being, as a result of" the defendant's activities which fit into the categories listed in KRS 454.210. *Caesars Riverboat*, 336 S.W. 3d at 58. Thus, even when the defendant's conduct falls within one of the enumerated categories in the long-arm statute, the plaintiff's claim still must *arise from* that conduct in order for personal jurisdiction to exist. *Id.* at 58–59 ("[T]he wrongful acts of the defendant alleged in the plaintiff's complaint must originate from the actions or activities that form the applicable statutory predicate for assertion of long-arm

6

jurisdiction."); *see also Dierig v. Lees Leisure Indus., Ltd.*, 830 F.Supp.2d 330, 338 (E.D. Ky. 2011) (applying a two-step inquiry as explained in *Caesars Riverboat Casino*, first as to whether one of the nine categories in KRS 454.210 is applicable, and second whether the cause of action actually arises from that particular conduct).

a

Plaintiffs argue that Harding's conduct falls within the "transacting any business" category in KRS 454.210(2)(a)(1). [R. 8 at 5–6.] Few Kentucky courts have assessed what constitutes "transacting business" since the Kentucky Supreme Court's decision in *Caesars*. Even before *Caesars* narrowed the scope of Kentucky's long arm statute, however, Kentucky courts have required a course of direct, affirmative actions within a forum that result in or solicit a business transaction.[2] *E.g., Caesars*, 336 S.W.3d at 58 (holding that casino was "transacting business" within the Commonwealth since it not only engaged in direct marketing activities in Kentucky, but also derived fifty percent of its revenue from Kentucky residents); *Intercargo Ins. Co. v. B. W. Farrell, Inc.*, 89 S.W.3d 422, 427 (Ky. Ct. App. 2002) (holding that, although the parent-subsidiary relationship by itself was not enough to establish personal jurisdiction over an out-of-state subsidiary defendant, the subsidiary had affirmatively availed itself of Kentucky law when it entered an indemnity contract executed in Kentucky); *Ford v. RDI/Caesars Riverboat Casino, LLC*, 503 F. Supp. 2d 839, 841–43 (W.D. Ky. 2007) (finding that the defendant transacted business in Kentucky where roughly half of its customers were from Kentucky, it derived substantial revenue—in excess of $109 million—from Kentucky residents, and it

---

[2] Valvoline relies on *Eat More Wings, LLC v. Home Mkt. Foods, Inc.*, to stand for the proposition that "even the slightest transaction is sufficient [under KRS 454.210(2)(a)(1)] … to bring a corporation within [the forum's] long-arm jurisdiction." 282 F.Supp.3d 965, 969 (E.D. Ky. 2017) (quoting *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504–05 (6th Cir. 2015)). The *Eat More Wings* Court's analysis, however, was cabined to certain types of communications when those communications were the bases of the action. *Id.* ("[m]aking phone calls, sending facsimiles, sending e-mails, letters, or other communications, standing along, 'may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action").

7

actively solicited business and engaged in charitable activities in Kentucky). Isolated actions are insufficient. *Compare Churchill Downs*, 2014 U.S. Dist. LEXIS 71672 *19–20 (one isolated contract insufficient), *with KFC Corp. v. Wagstaff*, 502 B.R. 484, 2013 U.S. Dist. LEXIS 86758, *27, 2013 WL 3166165 (W.D. Ky. 2013) (numerous long-term contracts with Kentucky-based franchisor were sufficient).

Valvoline has not shown that Harding has sufficiently "transacted business" in Kentucky. Harding is an Indiana company. [R. 1 at 1.] There is no evidence that Harding has any officers, employees, or physical location of its own here in Kentucky. [*Id.*] Valvoline relies on a variety of arguments as evidence that Harding conducted business here. Valvoline contends that Harding transacted business in Kentucky by (1) initiating contractual negotiations with Valvoline in Kentucky; (2) forming a contract in Kentucky; (3) agreeing to a choice-of-law clause in the contract; and (4) accepting a sum certain from Valvoline, who sent the money from Kentucky, as an advance under the contract. [R. 8 at 6.] First, Valvoline does not deny that the initial contractual offer was rejected. [R. 8 at 2.] Valvoline also does not deny that that it then approached Harding with the terms of the subsequent offer. [*See* R 8 at 8.] The two potential agreements at issue in this case were substantively different businesses proposals that were negotiated independently of one another. Consequently, it would not follow logically to equate Harding's initial sponsorship Proposal with Harding "transacting business" within Kentucky for purposes of the Agreement. Next, Valvoline choosing to execute the contract in Kentucky is not sufficient for this Court to confer jurisdiction over Harding. "[T]he key inquiry in personal jurisdiction cases concerns the activities of the *defendant,* not the plaintiff." *Spectrum Scan, Inc. v. AGM CA,* 3:07 CV 72 H, 2007 WL 2258860, at *3 (W.D.Ky. Aug. 2, 2007) (emphasis in original), *adhered to on denial of reconsideration sub nom. Spectrum Scan, LLC v. AGM*

8

*California,* 519 F.Supp.2d 655 (W.D.Ky. 2007).  Further, while Valvoline may have sent the sum certain to Indiana from their Kentucky office, "the plaintiff [or the plaintiff's own action(s)] cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285; *see Burger King* at 478 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot").  Valvoline chose to sign the Agreement and the check in its Kentucky office rather than its Indiana office.  To bring Harding within the purview of this Court on such "'random, fortuitous, or attenuated' contacts" would not comport with KRS 454.210(2)(a)(1).  *Walden*, 571 U.S., at 286 (quoting *Burger King* 471 U.S., at 475).  It is also without merit to suggest that the Court should infer a forum-selection clause from the parties' choice-of-law clause.  *See Gentry v. Mead*, 2016 WL 6871252, at *2 (E.D. Ky. Nov. 21, 2016).

    Insofar as the two parties contemplated, negotiated, and executed the Agreement, the Defendant did not "transact business" within the Commonwealth for purposes of KRS 454.210(2)(a)(1).  The facts show that Valvoline reached into Indiana to propose and negotiate the Agreement.  Moreover, Harding negotiated with Valvoline representatives in Valvoline's Indiana office.  Even though Valvoline asserts that a Valvoline employee in Kentucky "oversaw [its] side of the negotiations," Valvoline does not assert that Harding employees negotiated directly with the Kentucky employee, nor that they had any reason to know that the Kentucky employee was directing the Indiana employees in the negotiations. [R. 8 at 2.]  As Valvoline acknowledges, the Agreement itself contemplated Harding's performance as occurring within the confines of Indiana, targeting Indiana customers.[3]  [R. 1-1 at 9.]  in its Response, Valvoline

---

[3] Valvoline make the vague argument that, in addition to the "Schedule B" customers, "the parties subsequently agreed that Harding would solicit orders for Valvoline products from other entities throughout the region." [R. 8 at

9

repeatedly describes its Kentucky office as its headquarters. [See R. 8 at 3.] While Lexington may very well be Valvoline's headquarters, the contract simply describes Valvoline as "a Delaware limited liability company, having **an office** at 100 Valvoline Way, Lexington, Kentucky" [R. 1-1 at 2] (emphasis added). As the facts of this case reveal, Valvoline has more than one office within the region. In fact, Harding interfaced with Valvoline employees in the Indianapolis office while negotiating the present Agreement. [R. 8 at 2.]

Even if these contacts were sufficient, Plaintiffs still could not satisfy the second prong of Kentucky's long arm analysis. When it clarified the scope of the Kentucky Long Arm Statute in *Caesars*, the Kentucky Supreme Court also adopted a fairly narrow interpretation of the "arising out of" prong. *Caesars*, 336 S.W.3d at 57–59. There, the Court concluded that Caesars, a riverboat casino on the Indiana side of the Ohio River, had "transacted business" in Kentucky within the meaning of the long arm statute. *Id.* at 57–58. This was because the company had engaged in direct marketing campaigns through mail, television ads, and billboards in Kentucky, and because it derived over fifty percent of its revenue from Kentucky residents. Nonetheless, the Court held that long arm jurisdiction was not proper because the type of harm experienced by the plaintiff — a personal injury from a slip and fall — did not "arise out of" the casino's marketing activity in Kentucky. *Id.* at 59.

It cannot be said that the present lawsuit "arises out of" Harding's close nexus to Kentucky. The only connection Harding has to Kentucky in relation to the Agreement is that Valvoline, on its own volition, chose to sign the Agreement and issue a check from its Kentucky office. Simply put, the alleged claims by Valvoline do not originate from, or come into being, as

---

3.] As the Defendant notes, however, the Plaintiff does not assert that any part of Harding's expected performance would occur in Kentucky. [R. 9 at 3.]

10

a result of Harding's acting in Kentucky and therefore must be dismissed based on the lack of personal jurisdiction. *Caesars Riverboat Casino*, 336 S.W.3d at 58–59.

### III

Accordingly, for the aforementioned reasons, it is hereby ordered that Defendant Harding Racing LLC's Motion to Dismiss for Lack of Jurisdiction **[R. 6]** is **GRANTED**; and this case is **DISMISSED** and **STRICKEN** from the Court's active docket.

This is the 2nd day of February, 2021.

Gregory F. Van Tatenhove
United States District Judge